# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

THOMAS W. MCNAMARA, as Court-
Appointed Monitor,

        Plaintiff,

vs.

INTERCEPT CORPORATION, *et al.*,

        Defendants.

)
)
)
)
)
)
)
)
)
)

Case No.: 2:18-cv-02281-GMN-VCF

**ORDER**

Pending before the Court is the Motion to Dismiss, (ECF No. 17), filed by Defendants

Craig Dresser, Intercept Corporation, Connie Mosier, and Bryan Smith ("Defendants").

Plaintiff Thomas W. McNamara ("McNamara"), as court-appointed monitor in Case No. 2:12-

cv-00536-GMN-VCF filed a Response, (ECF No. 20), and Defendants filed a Reply, (ECF No.

24).

For the reasons discussed below, the Court **GRANTS in part** and **DENIES in part**

Defendants' Motion to Dismiss.

## I.    BACKGROUND

This case arises from McNamara's exercise of authority as court-appointed monitor (the

"Monitor") over the judgment debtors' assets in *Fed. Trade Comm'n v. AMG Servs., Inc.*, 2:12-

cv-00536-GMN-VCF ("*FTC v. AMG*"). In *FTC v. AMG*, the Court granted summary judgment

in favor of the Federal Trade Commission ("FTC") and against defendants, Scott Tucker

("Tucker") and his businesses, for operating a payday lending[1] scheme in violation of the FTC

Act, 15 U.S.C. § 45(a)(1). *See FTC v. AMG*, 2:12-cv-00536-GMN-VCF, 2016 U.S. Dist.

---

[1] The Court uses the term "payday lending" to describe the practice of offering "high-interest, short-term loans."
*See FTC v. AMG Capital Mgmt., LLC*, 910 F.3d 417, 421 (9th Cir. 2018).

LEXIS 135765, 2016 WL 5791416 (D. Nev. Sept. 30, 2016), *aff'd sub nom. Fed. Trade Comm'n v. AMG Capital Mgmt., LLC*, 910 F.3d 417 (9th Cir. 2018).

The FTC initially brought its action against Tucker, his businesses, and affiliates in 2012, alleging Tucker orchestrated a massive, criminally deceptive payday lending enterprise. The complaint brought claims for violations of § 5(a) of the FTC Act, the Truth in Lending Act, and the Electronic Funds Transfer Act. In addition to Tucker, the FTC named as defendants ten entities who furthered Tucker's scheme, including three of Tucker's loan servicing companies, three Indian tribes, and four corporate lending companies, all allegedly acting in furtherance of Tucker's scheme and under his control.

The Court found the FTC's evidence established that Tucker, through his loan servicing companies, directed the creation of sham lending corporations, also under Tucker's control. *FTC v. AMG*, 2016 WL 5791416, at *6–*7. The Court also concluded that the FTC put forth "overwhelming evidence" that Tucker and his lending companies operated a common enterprise for which they are jointly and severally liable for one another's wrongful conduct. *Id.* at *9. The Court ordered Tucker and his co-defendants to pay approximately $1.27 billion in equitable monetary relief to the FTC as compensation for consumer losses resulting from his scheme between 2008 and 2012. *Id.* at *12.

The parties subsequently negotiated a stipulated proposed order to resolve post-judgment matters including a stay of execution, an asset freeze pending appeal, and the appointment of a monitor to oversee the freeze and preserve assets to satisfy the Court's monetary judgment. (*See* Order Appointing Monitor and Freezing Assets ("Appointment Order"), Ex. A to Compl., ECF No. 1-1). The Court granted the parties' stipulated order and appointed McNamara as Monitor, authorizing him to preserve and recover assets on behalf of the "Monitorship Estate." (*See id.*). The Appointment Order defines the "Monitorship Estate" as "[a]ll of Scott Tucker's . . . and the Monitor Entities' Assets, wherever they may be located,

in whosever possession they may be found, whether owned directly or indirectly." (*Id.* § VI). "Monitor Entities" include the entities controlled by Tucker, their "successors, assigns, affiliates, and subsidiaries," and "[a]ny other entity identified by the Monitor . . . that holds Assets of a Defendant or existing Monitor Entity . . . ." (*Id.* Definitions ¶ H). The Order defines "Assets" as "any legal or equitable interest in, right to, or claim to, any real, personal, or intellectual property wherever located, including, but not limited to . . . cash or currency . . . or other accounts associated with any payments processed on behalf of any Defendant, including, but not limited to, such reserve funds held by a payment processor . . . regardless of when any Defendant acquired such interest, right, or claim." (*Id.* Definitions ¶ A). The Appointment Order directs McNamara, as Monitor, to " [i]nstitute, comprise, adjust, appear in, intervene, or become a party to such actions or proceedings in state, federal, or foreign courts that the Monitor deems necessary and advisable to preserve or recover the Monitorship Estate or to carry out the Monitor's mandate under this order." (*Id.* § VIII.R). Pursuant to the Appointment Order, McNamara filed multiple suits, including the present action, to claw back assets of the Monitorship Estate.

McNamara's instant Complaint seeks to recover funds from Defendant Intercept Corporation ("Intercept"), its founder, Bryan Smith ("Smith"), its former CEO, Craig Dresser, ("Dresser"), and its former Vice President of Risk Management, Connie Mosier ("Mosier"). (Compl. ¶¶ 3–6, ECF No. 1). McNamara alleges that Intercept is a third-party payment processor that accepted electronic funds transfers on behalf of its clients, including several Monitor Entities, through Intercept's Automated Clearing House ("ACH") system. (*Id.* ¶¶ 3, 31). According to McNamara, an ACH system allows lenders to transfer funds to their clients' bank accounts and vice-versa without having banking institutions directly transfer the funds between the lender and borrower. (*Id.* ¶¶ 20, 32). To illustrate, McNamara explains that in a typical transaction a Monitor Entity would instruct Intercept to withdraw repayments from a

payday loan borrower's bank account; Intercept would then have its own bank contact the borrower's bank to withdraw the funds; the borrower's bank would transfer the funds to Intercept's bank, and Intercept's bank would remit the funds to the lending Monitor Entity. (*See id.* ¶ 21). As compensation, Intercept collected fees or commissions for each transaction it processed. (*Id.* ¶¶ 17, 84). Defendants allegedly knew Tucker was engaging in fraud because transactions initiated by his companies generated "return rates"[2] of over 30%, but the industry average was 1.5%. (*Id.* ¶ 45). McNamara seeks to recover the fees and commissions paid by the Monitor Entities, alleging they are Assets of the Monitorship Estate. (*Id.* ¶¶ 12, 17).

After this Court's judgment in *FTC v. AMG*, the Government prosecuted Intercept in a related criminal case for knowingly processing payday loans made to borrowers in states that had effectively prohibited payday lending. (*See id.* ¶¶ 93–94, 98). Intercept pleaded guilty to violating 18 U.S.C. § 1960(a) and (b)(1)(C), which prohibits "transport[ing] or transmit[ting] . . . funds that are known to the defendant to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity." (*Id.* ¶ 94). As part of its plea, Intercept agreed to forfeit $5,928,893—the approximate sum of processing fees it received from facilitating payday loans to borrowers in states where payday lending was banned. (*Id.* ¶ 102). McNamara alleges that from May of 2008 through August of 2013 the total sum of fees Intercept received for processing illegal payday loans—those made in states where it was banned and those where it was legal but heavily regulated—totaled approximately $21,769,153.38. (*Id.* ¶ 99). McNamara now seeks to recover the fees Tucker and the Monitor Entities paid to Intercept for loans made to borrowers in states where payday loans were legal,

---

[2] McNamara alleges that a lender generating high return rates is an indicator of it engaging in fraudulent or illegal transactions. (Compl. ¶ 25). Transactions generating returns include transfers the borrower did not authorized and transfers initiated when the borrower's account has insufficient funds. (*Id.*).

but regulated, because Defendants allegedly knew that Intercept's services in those states enabled Tucker to violate state and federal law. (*Id.* ¶ 104).

## II.   <u>LEGAL STANDARD</u>

A court may dismiss a plaintiff's complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A properly pleaded complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). While Rule 8 does not require detailed factual allegations, it demands "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. In assessing the sufficiency of a complaint, a district court must accept as true all well-pled factual allegations in the complaint; however, legal conclusions are not entitled to the assumption of truth. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). The court must then consider whether the factual allegations in the complaint allege a plausible claim for relief. *Id.* When the claims in a complaint have not crossed the line from conceivable to plausible, plaintiff's complaint must be dismissed. *Twombly*, 550 U.S. at 570.

Additionally, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The rule requires that claims of fraud be accompanied by the "who, what, when, where, and how" of the conduct charged, *Vess v. Ciba-Geigy Corp., USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (quoting Cooper v. Pickett, 137 F.3d 616, 627 (9th Cir. 1997)), so that the complaint may not simply "lump multiple defendants together." *Destfino v. Reiswig*, 630 F.3d 952, 958 (9th Cir. 2011). In other words, the complaint "must include 'an account of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations.'" *Depot, Inc. v. Caring for Montanans, Inc.*, 915 F.3d 643, 668 (9th Cir. 2019) (quoting *Swartz v. KPMG, LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (per curiam)) (internal quotations omitted).

Rule 9(b)'s particularity requirement ensures that the defendants are on "notice of the particular misconduct . . . so that they can defend against the charge and not just deny that they have done anything wrong." *Vess*, 317 F.3d at 1106 (internal quotations omitted).

## III. DISCUSSION

McNamara's Complaint asserts claims against Defendants for: (1) civil conspiracy; (2) aiding and abetting fraud; and (3) aiding and abetting breach of fiduciary duty. (Compl. ¶¶ 105–123). Defendants move to dismiss the Complaint, arguing that: (1) McNamara does not have the authority to bring the claims; (2) the claims are time barred; (3) the Monitor Entities are *in pari delicto*; and (4) the Complaint fails to allege plausible claims for relief. The Court begins its analysis with McNamara's authority to bring the claims as Monitor.

### A. The Monitor's Authority

Defendants argue that the Appointment Order does not empower McNamara to pursue his claims because the Appointment Order's definition of "Assets" allegedly does not encompass the damages McNamara seeks. (MTD 10:6–11:13). The Court disagrees and concludes that the Appointment Order gives McNamara broad powers to initiate legal claims for money damages as long as the Monitor Entities would have standing to raise the claims.

"[A] district court's power to supervise an equity receivership and to determine the appropriate action to be taken in the administration of the receivership is extremely broad." *SEC v. Hardy*, 803 F.2d 1034, 1037 (9th Cir. 1986); *SEC v. Wencke*, 622 F.2d 1363, 1369 (9th Cir. 1980) ("[T]he authority derives from the inherent power of a court of equity to fashion effective relief."). "As an officer of the court, the receiver's powers are coextensive with his order of appointment." *Liberte Capital Grp., LLC v. Capwill*, 462 F.3d 543, 551 (6th Cir. 2006) (citing 13 Moore's Federal Practice ¶¶ 66.02–.03 (3d ed. 1999)).

Defendants argue that the Appointment Order's definition of "Assets" excludes "damages" or "harm" the Monitor Entities suffered from Tucker's alleged conspiracy with

Defendants. (MTD 10:8–10, 10:14–11:13). They argue that the Order limits the Monitor's possible recovery from payment processors like Intercept to their "reserve funds." (*Id.* 10:10–13). McNamara responds that the damages sought come within the Appointment Order's broad definition of "Assets," which encompasses "any legal or equitable interest in, right to, or claim to, any real, personal, or intellectual property wherever located." (Pl.'s Resp. to MTD ("Resp.") 3:10–5:9).

The Court concludes that McNamara has the authority to bring his claims. The Appointment Order empowers McNamara to bring actions to recover the Monitor Entities' "Assets." (Appointment Order, Definitions ¶ H and § VI). "Assets" include all "claims to any real, personal, or intellectual property . . . including . . . cash or other currency . . . ." (*Id.* 8:14–17). As a result, as long as McNamara may sustain a legal claim as the Monitor Entities' representative, the Appointment Order subsumes the damages sought within the Monitorship Estate. Even if a narrower reading were appropriate, Defendants' proposed interpretation is contrary to the Appointment Order's plain text. "Assets" also include, "reserve funds or other accounts associated with any payments processed on behalf of any Defendant *including, but not limited to*, such reserve funds held by a payment processor . . . ." (*Id.* 8:19–20) (emphasis added). Thus, reserve funds are but one example of the monies McNamara may recover for the Monitor Entities; he may recover any accounts associated with payments processed on their behalf.

McNamara seeks to recover fees the Monitor Entities paid to Intercept for processing loan transactions in connection with Tucker's conspiracy. (Compl. ¶ 17). The Appointment Order therefore authorizes this action through both its broad directive for the Monitor to initiate claims to the Monitor Entities' personal property and its more specific sanction of claims to accounts associated with payments processed on behalf of the Monitor Entities. Accordingly,

the Court concludes McNamara has the authority to bring this action.  The Court next considers whether McNamara's claims are timely.

### B. Statute of Limitations

Defendants contend that McNamara's claims are time-barred under either Nevada or Kansas's statute of limitations. (MTD 11:23–15:22).  For the reasons discussed below, the Court concludes that Kansas law regarding the statute of limitations applies and equitably tolled the limitations period until McNamara's appointment as Monitor.

Defendants argue in their Motion to Dismiss that because the applicable statute of limitations is a procedural issue, choice of law principals require the Court to apply the forum state's limitations period. (MTD 11:23–26).  They explain that Nevada would apply a three-year statute of limitations, but Nevada has a borrowing statute that will apply the limitations period of the state where the acts giving rise to the cause of action arose if that state's limitations period is shorter. (*Id.* 11:27–12:2).  Given that the cause of action arose in Kansas, and Kansas applies a two-year statute of limitations to McNamara's claims, Defendants initially conclude that "Kansas law applies," and bars McNamara's claims (*Id.* 12:2–15:22).

In response, McNamara concedes that Kansas's statute of limitations should apply. (*See* Resp. § F).  However, he argues: (1) the Kansas limitations period began to run when he had notice of the claim rather than when the acts giving rise to the claim arose; and (2) even if the claims would ordinarily be untimely, the adverse domination doctrine equitably tolled the statute of limitations. (*Id.* 19:24–27:15).

In their Reply, Defendants change course.  They argue that if the adverse domination doctrine permits McNamara's claims under Kansas law, then Nevada's limitations period applies because Nevada's borrowing statute only takes effect when a plaintiff's action would be barred by the other state's statute of limitations, and the claims are resultingly time barred because Nevada does not recognize the adverse domination doctrine. (Reply 6:2–7:4, ECF No.

24). Given the need for McNamara's response to Defendants' alternative argument, the Court ordered supplemental briefing. (Order, ECF No. 39). The Court now addresses: (1) which state's limitations period applies; (2) whether McNamara's claims would be barred under the applicable statute of limitations; and (3) if so, whether equitable tolling applies.

### 1. Choice of Law

The parties agree that Nevada law looks to the Restatement (Second) of Conflicts of Laws (the "Restatement") to determine the applicable statute of limitations. (Pl.'s Supp. Brief 1:13–15, 3:2–28, ECF No. 40); (Defs.' Resp. Supp. Brief 2:17–19, ECF No. 42). The parties dispute how the Court should apply the Restatement.

Section 142 of the Restatement governs the applicable statute of limitations. It provides:

> Whether a claim will be maintained against the defense of the statute of limitations is determined under the principles stated in § 6. In general, unless the exceptional circumstances of the case make such a result unreasonable:
> (1) The forum will apply its own statute of limitations barring the claim.
> (2) The forum will apply its own statute of limitations permitting the claim unless:
>     (a) maintenance of the claim would serve no substantial interest of the forum; and
>     (b) the claim would be barred under the statute of limitations of a state having a more significant relationship to the parties and the occurrence.

Defendants contend that Section 142(1) commands the Court to apply the Nevada statute of limitations barring the claim. (Resp. Supp. Brief 2:25–3:5).[3] McNamara counters that, "Section 142 . . . initially directs the Court to apply the principals of § 6," which would lead the Court to apply the Kansas limitations period because Kansas has the most significant relationship to the underlying action. (Pl.'s Supp. Brief 1:13–20, 4:1–5:7). Alternatively, he argues that if the § 6 analysis is not dispositive, the Court should apply the Kansas period

---

[3] The Court notes that unlike Kansas, Nevada has not adopted the adverse domination doctrine. *See USACM Liquidating Trust v. Deloitte & Touche*, 754 F.3d 645, 649 (9th Cir. 2014). Accordingly, Nevada's three-year statute of limitations would likely bar McNamara's claims; whereas, Kansas's two-year period may not, given the available equitable tolling defense.

because exceptional circumstances exist that make the application of Nevada's statute of limitations unreasonable. (*Id.* 1:20–2:26, 5:8–8:9).

The Court concludes that it should apply the Nevada statute of limitations under § 142(1) unless exceptional circumstances apply. Section 142 does not direct the Court to begin its analysis with § 6; rather, "the formulation of this rule is intended to reflect the general choice-of-law principals stated in Restatement (Second) of Conflicts of Laws § 6." *Lien Huynh v. Chase Manhattan Bank*, 465 F.3d 992, 1005 (9th Cir. 2006). Put differently, § 142 indicates that applying the forum's own limitation's period barring the claim best serves the purposes of § 6, barring exceptional circumstances. *Id.*

Exceptional circumstances of the present action persuade this Court to apply Kansas's statute of limitations to enable the possibility of equitable tolling. The Restatement does not define "exceptional circumstances." *Id.* Within the Ninth Circuit, "a wide range of factors may bear upon the analysis. At minimum, though, exceptional circumstances must be 'out of the ordinary course,' 'unusual,' or 'special.'" *Id.* (quoting Oxford English Dictionary (2d ed. 1989)). McNamara argues that "exceptional circumstances" are at play because the Appointment Order gives this Court "exclusive jurisdiction" over aspects of the Monitorship Estate, including: the entities included among Monitor Entities; the assets included within the Monitorship Estate, and disputes over the Appointment Order itself. (Supp. Brief 5:8–8:9); (*See* Appointment Order 4:5–6, 11:7–8, 18:26–19:4, 19:21–24, 23:17–20). As a result, he argues that inevitable disputes over issues for which this Court has exclusive jurisdiction would hamper an alternative forum's ability to efficiently adjudicate a suit to recover assets of the Monitorship Estate. (*Id.*)

The challenges highlighted by McNamara are exceptional circumstances. Forcing McNamara to file his case in Kansas to avail himself of the adverse domination doctrine would have been unreasonable. If the Court held otherwise, it would have forced the hypothetical

Kansas court to repeatedly certify questions to this Court over areas of this Court's exclusive jurisdiction. The problem is precisely why this Court transferred the Monitor's cases before other judges within this District to the undersigned. Therefore, the exceptional circumstances of this case persuade the Court to apply Kansas law implicating the timeliness of McNamara's claims.

### 2. Statute of Limitations

The Court finds that unless equitable tolling applies, McNamara's claims are time barred. Kansas law applies a two-year statute of limitations to fraud and breach of fiduciary duty claims. *See* Kan. Stat. Ann. § 60-513(a)(3)–(4) and (b). The limitations period begins to run when "the act giving rise to the cause of action first causes substantial injury" or "the fact of injury becomes reasonably ascertainable to the injured party." Kan. Stat. Ann. § 60-513(a)(3)–(4) and (b).

The parties dispute when the limitations period began to accrue. Defendants contend that the limitations period began to run when it was apparent the loans were unlawful: 2007. (MTD 12:18–15:22). McNamara argues that the period did not begin to run until his appointment on November 30, 2016. (Resp. 19:23–20:15).

The Kansas statute's text dictates the result—the claims began to accrue either when the acts "first cause[d] substantial injury" or when "injury bec[ame] reasonably ascertainable to the injured party." *See* Kan. Stat. Ann. § 60-513(b); *see also Cornett v. Roth*, 666 P.2d 1182, 1187 (Kan. 1983). Here, both events allegedly occurred in 2007 when the Monitor Entities began to pay fees to Defendants in furtherance of Tucker's scheme. (*See* Compl. ¶¶ 46–63). Nevertheless, McNamara contends that, under the statute, "a cause of action does not accrue until the claimant becomes aware of his injury, or should become aware of it." (Resp. 20:7–8). Unlike this Court explained with respect to fraudulent transfer claims, the text of the statute prescribes no Monitor-friendly discovery rule here because it bases the timeliness of the claim

on the injured party's discovery rather than the claimant's. *Compare* Kan. Stat. Ann. § 60-513(a)(3)–(4) and (b); with *McNamara v. Hallinan* ("*Hallinan*"), No. 2:17-cv-02967-GMN-BNW, 2019 U.S. Dist. LEXIS 168028, 2019 WL 4752265, at *7 (D. Nev. Sept. 30, 2019) (noting that the fraudulent transfer statue codifies a discovery rule "pursuant to which claims accrue either when the transfer was made, or 'within one year after the transfer and obligation was or could reasonably have been discovered by the *claimant*.'") (emphasis added) (quoting Kan. Stat. Ann. § 33-209). As a result, unless McNamara's claims have been equitably tolled, they are time barred.

### 3. Equitable Tolling

McNamara argues that if the Kansas statute of limitations applies, then the adverse domination doctrine tolled the limitations period until his appointment. (Resp. 20:16–21:15). The Court finds that the doctrine may apply, and the Court therefore cannot dismiss the claims as time barred.

The adverse domination doctrine "operates to toll the running of the statute of limitations when the directors or officers charged with the wrongful conduct dominate the board of the corporation to the extent that there are no directors who have knowledge of the facts giving rise to the possible liability who could have or would have induced the corporation to sue." *Resolution Trust Corp. v. Scaletty*, 891 P.2d 1110, 1112–13 (Kan. 1995). The doctrine arises in the context of breach of fiduciary duty and negligence claims "due to the control of the institution by culpable officers and directors, which precludes the possibility of filing suit because these individuals cannot be expected to . . . initiate any action contrary to their own interests." *Id.* Under the adverse domination doctrine, when there is a "single disinterested director" of the organization, the "limitations period would not run so long as there was no one with knowledge or facts giving rise to possible liability who could or would have induced the corporation to bring the action." *Id.* at 1113. Although the Kansas Supreme Court recognized

the doctrine in the context of an action by a receiver representing a corporation against the corporation's former shareholders, it may also apply when a suit is brought by a receiver against a controlling shareholder's co-conspirator. *See, e.g.*, *FDIC v. Gantenbein*, No. 90-2303-V 1992 U.S. Dist. LEXIS 15437, 1992 WL 279772, at *3 (D. Kan. Sept. 30, 1992) (finding the doctrine may toll a bank's malpractice claim against its former counsel); *see also Resolution Trust Corp. v. Gardner*, 798 F. Supp. 790, 795 (D.D.C. 1992); *Lease Resolution Corp. v. Larney*, 719 N.E.2d 165, 172 (Ill. Ct. App. 1999) (allowing suits against receivership entities' controlling shareholders' co-conspirators).

The Court finds that if the Kansas statute of limitations would have otherwise run against McNamara's claims, the adverse domination doctrine could have equitably tolled the limitations period. McNamara alleges that Tucker controlled the Monitor Entities during the time Defendants processed payments for the Monitor Entities. (*See* Compl. ¶ 15). As Tucker had complete control over the Monitor Entities, there is no one who could have reasonably brought the action until McNamara's appointment as Monitor. (*See id.*). Accordingly, the Court concludes that, based on the facts alleged in the Complaint, the statute of limitations may have been equitably tolled until the Monitor's Appointment on November 30, 2016. (*See generally* Appointment Order). McNamara filed the Complaint on November 29, 2018. (*See* Compl., ECF No. 1). The Court therefore treats his claims as timely.[4]

### C. *In Pari Delicto*[5]

Defendants allege that McNamara's claims are barred by the doctrine of *in pari delicto*. (MTD 15:23–16:24). The Court finds that the doctrine does not apply to McNamara's claims.

---

[4] A motion to dismiss should be granted based on a statute-of-limitations defense "only if the assertions of the complaint, read with the required liberality, would not permit the plaintiff to prove that the statute was tolled." *Jablon v. Dewan Witter & Co.*, 614 F.2d 677, 682 (9th Cir. 1980).

[5] The Court, now transitioning from procedure to substance, notes that Kansas law applies to McNamara's claims. *See Hallinan*, 2019 WL 4752265, at *5–*7 (discussing choice of law).

Under the doctrine of *in pari delicto*, "[i]n a case of equal or mutual fault . . . the position of the [defending] party . . . is the better one." *Mosier v. Callister, Nebeker & McCullough*, 546 F.3d 1271, 1275 (10th Cir. 2008) (internal modifications original) (quoting *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 306 (1985)). Put differently, "a plaintiff's recovery may be barred by his own wrongful conduct." *Id.* (quoting *Pinter v. Dahl*, 486 U.S. 622, 632 (1988).

Defendants argue that McNamara stands in the shoes of the Monitor Entities and may not raise claims that the Monitor Entities could not raise themselves. (MTD 15:23–16:7). Here, they argue that the Monitor Entities cannot recover damages they incurred in the commission of a fraud they themselves perpetrated. (*Id.* 16:8–24). Relying on a Kansas bankruptcy case, they conclude that because a bankruptcy trustee cannot raise claims on behalf of a bankruptcy petitioner when the petitioner is *in pari delicto*, McNamara may not do so here on behalf of the Monitor Entities. (*Id.*). McNamara contends that the doctrine does not apply to monitors or receivers bringing claims for the benefit of creditors of the entities in a monitorship or receivership. (Resp. 16:23–25:14).

Few courts have grappled with the application of *in pari delicto* to claims brought by monitors or receivers[6] against a co-conspirator of the entity in the monitorship or receivership. However, the Seventh Circuit has been among the few, and this Court finds the Circuit's approach persuasive given the absence of corollary Kansas law.

---

[6] Defendants attempt to distinguish McNamara, a court-appointed monitor, from receivers. (MTD 13:3–15:22). They argue that the Monitor, unlike a receiver, is subject to the same legal defenses that could be levied against the Monitor Entities had they themselves brought suit, thus making McNamara *in pari delicto*. (*Id.*). The Court finds that a monitorship is subject to the same equitable considerations as a receivership, and equitable defenses against the Monitor Entities' may lose their teeth now that the wrongdoer, Tucker, has been removed from the Monitor Entities by the Monitor's appointment. *Cf. Scholes*, 56 F.3d at 754–55; *see also SEC v. Liu*, No. 16-00974-CJC(AGRx), 2016 U.S. Dist. LEXIS 91078 at *34–*35 (C.D. Cal. July 11, 2016) (explaining that a monitor is "a type of court-appointed receiver"); (Appointment Order at 16:11–16) (explaining that "The Monitor shall comply with any laws . . . governing receivers . . . .")

The court was first presented with the issue in *Scholes v. Lehmann*, 56 F.3d 750 (7th Cir. 1995). In *Scholes*, the plaintiff-receiver represented three corporations whose sole shareholder, Michael Douglas, weaponized as tools in a Ponzi scheme. *Scholes*, 56 F.3d at 752. To execute the scheme, Douglas created the corporations, and he caused the corporations to create limited partnerships. *Id.* The corporations were the general partners of the partnerships, and they sold limited partnership interests to the public by representing that the interests would generate 10%–20% returns per month. *Id.* Investors paid the corporations to obtain partnership shares; the corporations passed the early investments to shareholders in order to give the scheme an appearance of credibility; and Douglas enriched himself with the investors' money once the scheme grew. *Id.* The SEC prevailed in a civil suit against Douglas and the corporations, and the district court appointed a receiver to recover assets on behalf of the corporations for the court to distribute to the defrauded investors. *Id.* 752–53.

Scholes, as receiver, brought an action under Illinois's fraudulent conveyance statute against individuals to whom Douglas transferred assets of the scheme: one investor in the Ponzi scheme who made a profit, several religious institutions, and Douglas's ex-wife. *Id.* at 753. The defendants argued that Scholes could not recover the funds. *Id.* at 753. They contended that Scholes possessed no greater rights than the corporations themselves; the corporations could not wind back the transfers because they were at fault; and Scholes therefore did not have standing to bring the claims because the corporations themselves could not assert them. *Id.* at 753–54.

The court began by explaining how the transfers injured the corporations—conferring their standing—even though the corporations initiated the transfers. The court explained that Douglas was responsible for the transfers as the corporations' sole shareholder, but the corporations were injured by the transactions because they were legally separate persons from

Douglas. *Id.* at 754. Douglas, however, could not have lawfully ratified the fraudulent

conveyances because the transfers harmed the corporations' creditors, their limited partners. *Id.*

Therefore, the court articulated the grounds for the receiver's standing as follows:

> The rule is that the maker of the fraudulent conveyance and all those in privity with him—which certainly includes the corporations—are bound by it. But the reason, of course, . . . is that the wrongdoer must not be allowed to profit from his own wrong by recovering property that he had parted with in order to thwart his creditors. That reason falls out now that Douglas has been ousted from control of and beneficial interest in the corporations. The appointment of the receiver removed the wrongdoer from the scene. . . . Put differently, the defense of *in pari delicto* loses its sting when the person who is *in pari delicto* is eliminated. Now that the corporations created and initially controlled by Douglas are controlled by a receiver whose only object is to maximize the value of the corporations for the benefit of investors and any creditors, we cannot see the objection to the receiver's bringing suit to recover corporate assets unlawfully dissipated by Douglas. *Id.* at 754–55 (internal citations omitted).

Thus, under *Scholes*, when a receiver is appointed to recover assets of a corporate

wrongdoer, the receiver is not *in pari delicto* once the person that directed the receivership

entity's wrongful conduct is removed by the receiver's appointment. However, the Seventh

Circuit explained the rule only applies if the defendants benefitted from the receivership

entity's wrongful conduct in *Knauer v. Jonathon Roberts Fin. Group, Inc.*, 348 F.3d 230 (7th

Cir. 2003).

*Knauer* involved a similar set of facts wherein a district court appointed a receiver to

recover assets of corporations utilized in a Ponzi scheme. *Knauer*, 348 F.3d at 231. The

receiver represented Heartland Financial Services, Inc. and JMS Investment Group, LLC, two

entities affiliated with the individuals who directed the scheme, Kenneth Payne and Daniel

Danker. *Id.* During the operation of the Ponzi scheme, Payne and Danker were licensed

securities representatives of the defendant broker-dealers. *Id.* at 231–32. Knauer, the receiver,

brought various claims against the broker-dealers for failing to adequately supervise Payne and

Danker. *Id.* at 232. The court concluded that the receiver could not recover because receivership entities were of equal fault with defendants; defendants' only wrong was failing to supervise Payne and Danker; and, unlike the receivership entities, defendants did not benefit from the underlying Ponzi scheme. *Id.* at 236–37 and 237 n.6. ("Had the broker dealers been directly involved in the embezzlements, or attained some tangible benefits from them, this would be a different case.").

Here, the Court finds that the Complaint alleges sufficient facts to avoid dismissal on Defendants' *in pari delicto* defense. McNamara alleges that Defendants knew or should have known about the underlying illegality of Tucker's payday lending scheme. (*See* Compl. ¶¶ 12–14, 39–84, 93–104). Likewise, Defendants allegedly derived substantial benefits from payment processing fees they generated in furtherance of the scheme. (*Id.* ¶ 99). Despite knowing that the Monitor Entities generated abnormally high return rates for transactions, Defendants allegedly continued to work with Tucker to further enrich themselves. (*See id.* ¶¶ 39–84). Additionally, the Monitor's appointment has removed Tucker, the only wrongdoer. As in *Scholes*, Tucker exercised complete control over the Monitor Entities and their participation in the underlying payday lending scheme. (*Id.* ¶ 15). Now that Tucker has been removed from the Monitor Entities by the Monitor's appointment, the Court cannot say that the Monitor Entities are of equal fault with Defendants. To the contrary, Defendants profited from Tucker's payday lending scheme, and McNamara seeks to claw back Defendants' profits to compensate Tucker's victims by satisfying the *FTC v. AMG* judgment. (*Id.* ¶ 11). Therefore, viewing the facts alleged in the light most favorable to McNamara, the *in pari delicto* defense would not bar his claims.

### D. 12(b)(6)

The Court now discusses whether McNamara's Complaint has stated a plausible claim for relief. The Court finds that McNamara has not adequately alleged his standing to raise

claims for civil conspiracy or aiding and abetting fraud.  Nevertheless, McNamara has stated a plausible claim for aiding and abetting breach of fiduciary duty against Intercept.

### 1. Civil Conspiracy

The Court begins its analysis of McNamara's civil conspiracy claim with standing.  The Court finds that McNamara does not have standing to bring the claim as alleged.

To state a claim for civil conspiracy, a plaintiff must plead the following elements: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof." *Citizens State Bank v. Gilmore*, 603 P.2d 605, 613 (Kan. 1979).  "A civil conspiracy is not actionable under Kansas law without commission of some wrong giving rise to a tortious cause of action independent of conspiracy." *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. Pepsico, Inc.*, 431 F.3d 1241, 1268 (10th Cir. 2005).  The party bringing the claim must have been the victim of the underlying tort alleged in the conspiracy. *See Meyer v. Christie*, 634 F.3d 1152, 1156–57 (10th Cir. 2011) (stating, "[w]e therefore hold that each plaintiff asserting a conspiracy claim under Kansas law must have suffered some wrong giving rise to a tortious cause of action independent of conspiracy,' and may not simply adopt the tortious injury suffered by another.") (internal citations and quotations omitted).

McNamara does not have standing to bring his claim for civil conspiracy because he does not allege that the Monitor Entities were victims of Defendants' fraud.  Rather, the Complaint alleges that Defendants and Tucker conspired to commit fraud against payday loan borrowers through the Monitor Entities. (*See* Compl. ¶ 108) (explaining that the overt acts in furtherance of the conspiracy include: (a) "issu[ing] hundreds of thousands of illegal payday loans;" (b) issuing "said loans to consumers in states where payday lending was illegal . . . or regulated;" and (c) Defendants participated by "processing [said] loans . . . .").  The fraudulent scheme injured the payday loan borrowers but enriched the Monitor Entities as well as the

Defendants. However, the "damages" McNamara seeks to recover are the payment processing fees the Monitor Entities paid to Defendants. (Compl. ¶ 112). The alleged damages were not proximately caused by Defendants' torts against the Monitor Entities; instead, McNamara attempts to "adopt the tortious injury suffered by another" in order to recover the costs of executing the payday loan scheme. *See Meyer*, 634 F.3d at 1156–57. While McNamara's representative capacity may blunt the force of equitable defenses that could be asserted against the Monitor Entities—as is the case here regarding *in pari delicto*—his status as Monitor does not confer him greater standing than that of the Monitor Entities. *See Hallinan*, 2019 WL 4752265 at *4 ("In recovering assets of the Monitorship Estate, McNamara does not represent the defrauded investors whose collective injuries served as the basis for the $1.27 billion judgment. Rather, McNamara stands in the shoes of the Monitor Entities, the assets of which, once located and discovered, will facilitate post-judgment enforcement of this Court's Order by maximizing the value of the Monitorship Estate.").

Here, McNamara must allege that the Defendants conspired to defraud the Monitor Entities. There is no allegation in the Complaint that Defendants did so. Nevertheless, while unlikely, it is possible that McNamara could allege that Defendants perpetrated a fraud on the Monitor Entities. The Court accordingly dismisses McNamara's civil conspiracy claim with leave to amend to the extent he may allege the Monitor Entities were victims of Defendants' fraud.

### 2. Aiding and Abetting Fraud

For the same reason as discussed above, the Court concludes that McNamara does not have standing to bring his aiding and abetting fraud claim as alleged. To prevail on a claim of aiding and abetting fraud, the plaintiff must show that it itself was a victim of the alleged fraud. *See, e.g.*, *York v. InBank Trust, N.A.*, 962 P.3d 405, 418 (Kan. 1998) (superseded in part by statute). Just as with the civil conspiracy claim, the Complaint alleges that Defendants and the

Monitor Entities effectuated the underlying fraud against the payday loan borrowers. (Compl. ¶¶ 114, 118). McNamara does not allege Defendants defrauded the Monitor Entities (*Id.* ¶¶ 113–118). He therefore does not have standing to recover the payment processing fees as tort damages. *See, e.g.*, *Scholes v. Schroeder*, 744 F. Supp. 1419, 1422 (N.D. Ill. 1990) ("Fraud on investors that damages those investors is for those investors to pursue – not the receiver. By contrast, fraud on the receivership entity that operates to its damage is for the receiver to pursue . . . .") (emphasis original). Therefore, the claim is dismissed without prejudice. McNamara may amend the claim to the extent he can allege Defendants aided and abetted in perpetrating a fraud on the Monitor Entities.

### 3. Aiding and Abetting Breach of Fiduciary Duty

The Court finds that McNamara has plausibly alleged his claim for aiding and abetting breach of fiduciary duty against Intercept. To assert a claim for breach of fiduciary duty, a plaintiff must allege: (1) a fiduciary relationship existed between plaintiff and defendants; (2) defendants had a legal duty to plaintiff based upon the fiduciary relationship; and (3) defendants breached that duty. *See Cargill Meat Solutions Corp. v. Premium Beef Feeders, LLC*, 168 F. Supp. 3d 1334, 1339 (D. Kan. 2016). The party asserting the existence of the fiduciary relationship bears the burden of establishing that the relationship was created either: (1) by contract; or (2) by implication, from "the facts surrounding the involved transactions and the parties' relationship." *Id.* In addition to the preceding elements, a claim for aiding and abetting requires: "(1) the party whom the defendant aids must perform a wrongful act that causes injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; [and] (3) the defendant must knowingly and substantially assist the principal violation." *State* ex rel. *Mays v. Ridenhour*, 811 P.2d 1220, 1232 (Kan. 1991) (quoting *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983)). Whether the defendant provided substantial assistance depends on weighing a number

of factors, including: "[t]he nature of the acts encouraged, the amount of assistance given by the defendant, his presence or absence at the time of the tort, his relation to the other [guilty party] . . . his state of mind . . . . [and the] duration of the assistance provided." *Id.* at 1232, 1234 (internal quotations omitted) (quoting Restatement (Second) of Torts § 876, cmt. d).

McNamara has sufficiently alleged that Tucker breached his fiduciary duty to the Monitor Entities. The Complaint alleges facts indicating that Tucker had a fiduciary relationship implied in law with the Monitor Entities because, as the Monitor entities were under Tucker's complete control, there was "confidence reposed on one side and resulting domination and influence on the other." (*See* Compl. ¶¶ 15, 37, 120); *Ritchie Enterprises v. Honeywell Bull, Inc.*, 730 F. Supp. 1041, 1053 (D. Kan. 1990). The Complaint contains ample allegations that Tucker breached his duty by enriching himself at the expense of the Monitor Entities by diverting their assets for his personal benefit and by directing their actions in furtherance of his fraud, which exposed them to future liability. (*See* Compl. ¶¶ 72, 85–92, 121). The allegations indicate that Tucker breached his fiduciary duties to the Monitor Entities because "[a]ny unfair transaction induced by a fiduciary relationship between the parties gives rise to a liability with respect to unjust enrichment of the fiduciary." *Newton v. Hornblower, Inc.*, 582 P.2d 1136, 1146 (Kan. 1978).

Likewise, McNamara has alleged facts that plausibly support his aiding and abetting claim against Intercept. The FTC case establish that the party Defendants aided (Tucker) caused injury. (Compl. ¶¶ 1, 72, 85–92, 122–123). McNamara alleges that Intercept was generally aware that it enabled Tucker's unlawful payday lending scheme by processing payments on behalf of the Monitor Entities. (*See id.* ¶¶ 43–45) (explaining that Intercept sought to cultivate Defendants' business despite the Monitor Entities having a return rate twenty times higher than the industry average); (*id.* ¶¶ 51–67) (demonstrating Intercept's awareness of consumer complaints regarding Tucker's operation of the Monitor Entities and Tucker's

centrality to Intercept's business as one of its largest customers). And, as Intercept admitted through its guilty plea in the related criminal case, it knew of its role in illegal payday lending schemes, including Tucker's. (*id.* ¶ 94) (explaining that Intercept pleaded guilty to "transport[ing] or transmit[ting] funds that are known to defendant to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity."). Finally, McNamara has alleged facts indicating that Intercept provided substantial assistance in Tucker's scheme. McNamara alleges that Intercept knowingly provided Tucker with assistance over many years for Intercept's own benefit, and the Monitor Entities could not have offered the usurious loans without Intercept processing the borrowers' payments. (*See* Compl. ¶¶ 12, 43–45, 51–67, 94).

Finally, Defendants argue that McNamara has not alleged sufficient facts to state plausible claims against the individual Defendants. The Court agrees. McNamara has alleged facts regarding directives the individual Defendants made, but not sufficient facts to support each element of aiding and abetting breach of fiduciary duty claims against the individual defendants. (*See* Compl. ¶¶ 40–42, 48–50, 54–65, 71, 74, 76–79). The Court therefore dismisses the claims with leave to amend.

//
//
//
//
//
//
//
//
//

**IV.    CONCLUSION**

   **IT IS HEREBY ORDERED** that the Motion to Dismiss, (ECF No. 17), is **GRANTED in part** and **DENIED in part**.  McNamara's civil conspiracy and aiding and abetting fraud claims are dismissed with leave to amend.  McNamara's aiding and abetting breach of fiduciary duty claim is dismissed as against the individual defendants with leave to amend.

   **IT IS FURTHER ORDERED** that McNamara shall have twenty-one (21) days from entry of this Order to file an amended complaint.

   **DATED** this   31   day of March, 2020.

_____
Gloria M. Navarro, District Judge
United States District Court